UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT TROY COOK,

    Plaintiff,

    v.

MATTHEW CATE, et al.,

    Defendants.

Case No. 11-cv-06581-YGR (PR)

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT; (2) REFERRING CASE TO PRO SE PRISONER SETTLEMENT PROGRAM; AND (3) ADDRESSING REMAINING PENDING MOTIONS**

## INTRODUCTION

Plaintiff Scott Troy Cook, a state prisoner currently incarcerated at Pelican Bay State Prison ("PBSP"), filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983.  Thereafter, he filed an amended complaint in which he challenged his placement and retention in Administrative Segregation ("Ad-Seg") in the Security Housing Unit ("SHU") at PBSP on the basis of association with the Aryan Brotherhood ("AB") prison gang.  Plaintiff alleged violations of his Eighth Amendment and Fourteenth Amendment rights, as well as several state law claims.  He named numerous Defendants from PBSP in Crescent City, the California Department of Corrections and Rehabilitation ("CDCR") in Sacramento, as well as the California Substance Abuse Treatment Facility ("CSATF") and Corcoran State Prison ("CSP"), both in Corcoran.  He is seeking injunctive relief and monetary damages.

In an Order dated January 29, 2013, the Court issued its Order of Service upon finding Plaintiff's claims cognizable as violations of the Fourteenth Amendment and various provisions of California constitutional and statutory law.  (Dkt. 10 at 5.)   The Court dismissed the remaining claims, including Plaintiff's Eighth Amendment and First Amendment claims, claims against Doe Defendants, and claims against all named Defendants from CSATF and CSP.  (*Id.*)

On May 28, 2013, Defendants filed an answer to the amended complaint.  (Dkt. 40.)

On September 20 and 25, 2013, Plaintiff filed identical motions to compel discovery. (Dkts. 54, 58.)  The first motion to compel discovery included a brief in support of that motion

(dkt. 55); therefore, the Court will be citing to the first one when resolving these motions below. On October 18, 2013, Defendants filed an opposition to Plaintiff's motions to compel discovery. (Dkt. 61.)

On November 25, 2013, Defendants filed an administrative motion to seal. (Dkt. 69.) Defendants submitted under seal for the Court's *in camera* review the following items: (1) four confidential gang investigation memoranda and their attachments; and (2) a confidential validation disclosure worksheet. Defendants also submitted a proposed protective order to govern review of these items. The Court has reviewed the items *in camera* and will grant separately the protective order proposed by Defendants.

Also on November 25, 2013, Defendants filed a motion for judgment on the pleadings and for summary judgment. (Dkt. 70.)

On December 23, 2013, Plaintiff filed a notice of pendency of other actions, regarding *Ashker, et al. v. Brown Jr., et al.*, Case No. C 09-05796 CW.[1] (Dkt. 78.)

On January 24, 2014, Plaintiff filed his (1) statement of non-opposition to Defendants' motion for judgment on the pleadings as to his claims against Defendant PBSP Appeals Coordinator C. E. Wilber and his state law claims; and (2) opposition to Defendants' motion for judgment on the pleadings and for summary judgment as to all of his remaining claims.

On March 26, 2014, Defendants filed their reply to Plaintiff's opposition. (Dkt. 87.)

Having read and considered the papers submitted by the parties, the Court hereby GRANTS in part and DENIES in part Defendants' motion for judgment on the pleadings and for summary judgment, and it directs the remaining parties to engage in settlement proceedings.

## DISCUSSION

### I.    FACTUAL BACKGROUND

#### A.    The Gang Validation Process

The following overview of the gang validation process, unless otherwise stated, is taken

---

[1] In Case No. C 09-05796 CW, inmate Todd Ashker alleged a similar due process violation regarding CDCR's procedure for assigning and retaining inmates in the SHU at PBSP. On April 9, 2013, the Honorable Claudia Wilken denied Defendants' motion to dismiss. (Dkt. 191 in Case No. C 09-05796 CW.) A summary judgment motion has not yet been filed in that case.

from *Madrid v. Gomez*, 889 F. Supp. 1146, 1241-1243, (1995).

The procedure for establishing gang membership or association is referred to as the "validation" process. Every institution within the CDCR, employs at least one Institutional Gang Investigator ("IGI") who is responsible for tracking gang activities and investigating those suspected of gang membership. Whenever a gang investigator obtains evidence that an inmate has associated with other gang affiliates, it is noted in the inmate's central file ("C-file").

The CDCR identifies a gang associate as "an inmate . . . who is involved periodically or regularly with members or associates of a gang." Cal. Code Regs., tit. 15, § 3378 (c)(4). The text of section 3378, subdivision (c)(4) provides: "This identification requires at least three (3) independent source items of documentation indicative of association with validated gang members or associates. Validation of an inmate/parolee or any person as an associate of a prison gang shall require at least one (1) source item be a direct link to a current or former validated member or associate of the gang, or to an inmate/parolee or any person who is validated by the department within six (6) months of the established or estimated date of activity identified in the evidence considered." *Id.* Source items may include a statement from another inmate, an inmate's own admission, tattoos, written materials, photographs, observations by staff, and information from other agencies. (Dkt. 77, Furlong Declaration ("Furlong Decl.") at ¶ 7.) The source items must meet the reliability criteria described in sections 61020.7 through 61020.10 of the CDCR Departmental Operations Manual. (*Id.* at ¶ 8, Ex. A.)

Once the IGI believes that there is sufficient documentation to validate an inmate, the IGI prepares a "validation package" for submission to the Special Services Unit ("SSU") of the Office of Correctional Safety ("OCS") in Sacramento, California. This package includes photocopies of each source document relied upon, a written itemization of the evidence, and a description of the inmate's distinctive markings and tattoos, if any. Once the package is completed, the inmate is brought to the office of the IGI, where the inmate is told that he is suspected of gang affiliation, and provided a copy of a form summarizing the evidence relied upon.

All non-confidential source items are disclosed to the inmate. *See* Cal. Code Regs., tit. 15, § 3378(c)(6)(C). When the evidence in the validation package includes information from a

United States District Court
Northern District of California

1  confidential source, the inmate is provided with a Confidential Information Disclosure Form

2  ("CDCR-1030").  The form briefly summarizes the substance of the accusation, insofar as that can

3  be done without disclosing the informant's identity.  The form also identifies the basis for the

4  IGI's determination that the information is reliable.  Confidential information used in the

5  validation process is disclosed to the inmate to the extent possible by providing him a confidential

6  information disclosure form disclosing the non-confidential portions of the evidence.  (Furlong

7  Decl. ¶ 9.)  The inmate is also given written notice that he will be interviewed in connection with

8  the validation process and allowed time to prepare for that interview.  (*Id*. at ¶ 9.)  Due process

9  requires that IGIs hold an informal non-adversary hearing within a reasonable time after the

10  inmate is segregated, inform the inmate of the charges against him or the reasons segregation is

11  being considered, and allow the inmate to present his views.  The inmate is not, however, given an

12  opportunity to present evidence, examine witnesses or obtain legal assistance.  At the interview,

13  the inmate may respond verbally and in writing to the validation allegation and the source items

14  considered as part of the validation.  (*Id*.)

15      After the interview, if the IGI determines that sufficient evidence supports the validation,

16  the IGI Unit submits the evidence, supporting documents, and the inmate's response to the

17  evidence – all of which comprise the validation package – to the OCS with a recommendation that

18  the inmate be validated.  (*Id*.)  An SSU review committee then analyzes the package for accuracy,

19  completeness, and compliance with CDCR's gang validation guidelines, and determines which

20  source items meet the validation requirements.  (Decl. of E. Fischer, Dkt. 76 ("Fischer Decl.")

21  ¶¶ 7-8.)  If a package contains more than the minimum three items of evidence, the SSU review

22  committee may reject certain items as "not acceptable" or "not usable," but it may still validate the

23  inmate so long as at least three items remain that are not rejected.  If the package appears to be in

24  order, the SSU review committee will officially "validate" the inmate as a member or associate of

25  a prison gang by signing a general chrono ("CDCR-128-B") and sending it to the IGI Unit.

26  (Fischer Decl. ¶ 10.)

27      Because gang associates endanger institutional safety, inmates under investigation for

28  possible gang validation are housed in Ad-Seg.  *See* Cal. Code Regs. tit. 15, § 3335(a).  Placement

4

1   in Ad-Seg is reviewed within ten days by the Institutional Classification Committee ("ICC"),

2   which determines whether to retain the inmate in segregation or release him to the general

3   population. *Id*. at § 3335(c). Once validated, the inmate "is deemed to be a severe threat to the

4   safety of others or the security of the institution" and is placed in the SHU for an indeterminate

5   term. *Id*. at § 3341.5(c)(2)(A)(2). An inmate assigned to an indeterminate SHU term shall be

6   reviewed by a classification committee at least every 180 days for consideration of release to the

7   general population. *Id*. at § 3341.5(c)(2)(A)(1). He may be released from the SHU if he becomes

8   "inactive" in the gang – free of gang activity for six years – or chooses to debrief with officials

9   about gang activities. *Id*. at §§ 3341.5(c)(4)-(5), 3378(e).

**B.   Prior to Plaintiff's Gang Validation**

10

11       On September 17, 2008, Plaintiff, who was housed at CSATF at that time, was notified

12   that he would be removed from general population at CSATF and placed in Ad-Seg pending his

13   proposed validation with the AB prison gang. (Dkt. 7 at 7.)[2] IGI Sergeant A. Hernandez and

14   Assistant IGI S. Furlong provided Plaintiff with a Validation Interview Notification and

15   Disclosure Form. (*Id.* at 8.) They explained to Plaintiff that the validation investigation was

16   complete, and he would be interviewed regarding the proposed AB validation, at which time he

17   could present rebuttals to the IGI's evidence. (*Id.*) Plaintiff was given twenty-four hours to

18   prepare a response to these allegations. (*Id.*)

19       IGIs Furlong and Hernandez submitted five source items, which they thought

20   demonstrated Plaintiff's involvement with the AB. Plaintiff was given non-confidential versions

21   of the four source items provided, and the complete version of the fifth source item, which was not

22   confidential. (Decl. of S. Furlong, Dkt. 77 ("Furlong Decl.") ¶ 19.) Specifically, as to four of

23   these source items, IGIs Furlong and Hernandez  provided Plaintiff with four CDCR-1030s[3] which

24   notified Plaintiff that confidential information relating to him had been received and put in his file.

25   _____

26       [2] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Plaintiff.

27       [3] As mentioned above, a CDCR-1030 is used by prison officials to let the prisoner know that the source item is from a confidential source, i.e. an inmate-informant. The form states why it

28   is considered reliable information, and it describes the item in general terms without identifying, for example, the name of the inmate-informant.

1   (Dkt. 7 at 7; Furlong Decl. ¶ 19.)  The final source item demonstrating involvement with the AB

2   was explained on a CDCR-128-B, a general chrono describing a non-confidential validation item.

3   (*Id.*)

4        All five items were submitted to support Plaintiff's validation, but only three were

5   accepted as meeting validation requirements.  (Dkt. 7 at 42.)  Specifically, the three items used for

6   Plaintiff's validation included: one coded message authored by Plaintiff to a validated AB member

7   (June 18, 2008 Confidential Memorandum); another coded message sent to him by a validated

8   member of the AB (September 15, 2008 Confidential Memorandum); and a general chrono, which

9   indicated that a piece of paper found in Plaintiff's cell had the name and address of a validated AB

10  associate on it (September 17, 2008 CDCR-128-B).  (Dkt. 7 at 7; Furlong Decl. ¶ 19.)

11       On September 18, 2008, IGIs Furlong and Hernandez returned to conduct Plaintiff's

12  validation interview.  (Dkt. 7 at 8.)  Plaintiff states that he submitted a four-page written statement

13  rebutting the validation source items, but that no such interview took place.  (*Id.*; Dkt. 83 at 3.)

14  Meanwhile, Assistant IGI Furlong states that Plaintiff submitted a written rebuttal and declined to

15  participate in the interview.  (Furlong Decl. at 8.)

16       **C.    Plaintiff's Gang Validation and Assignment to Ad-Seg**

17       On September 19, 2008, the gang validation package was submitted to the SSU review

18  committee – comprised of Defendants OCS Special Agents Everett W. Fischer, J. A. Harrison, and

19  Keri Berkler – for review and approval.  (Decl. of E. Fischer, Dkt. 76 ("Fischer Decl.") ¶ 11, Ex.

20  A, Ex. B filed under seal and *in camera*.)  The gang validation package contained a gang

21  validation worksheet, the validation notification, Plaintiff's written rebuttals to the source items,

22  the four CDCR-1030s, and a memorandum by Assistant IGI Furlong summarizing the evidence

23  supporting the proposed validation.  (Fischer Decl. ¶ 11, Ex. A, Ex. B filed under seal and *in*

24  *camera*.)  Meanwhile, Plaintiff contends that he was never given a written response on why his

25  written rebuttal was unpersuasive.  (Dkt. 7 at 53.)

26       On September 25, 2008, Plaintiff appeared before the CSATF ICC for initial segregated

27  housing review, at which time he waived the right to call witnesses and waived his seventy-two

28  hour notice.  (*Id.* at 29.)  The Initial Classification Chrono ("CDCR-128-G") from the ICC review

6

regarding Plaintiff's segregated housing status stated: "INITIAL REVIEW: RETAIN IN AD/SEG PENDING COMPLETION OF OCS REVIEW RELEVANT TO PRISON GANG INVOLVMENT, POTENTIAL GANG VALIDATION. . . ."  (Decl. of E. Ganahl, Dkt. 75 ("Ganahl Decl.") Ex. D.)  The ICC further commented on whether Plaintiff's segregated housing assignment was based on any specific threat to safety, stating: "After a review of all case factors and noting an in-cell Mutual Combat on 1/7/05 @ CSP-COR.  On 6/18/04 'S' stabbed an inmate while on the exercise yard @ CEN-IV.  There exists no pattern of in-cell violence or predatory behavior towards cellmates . . . ."  (*Id.*)

On October 22, 2008, Defendants Fischer, Harrison and Berkler reviewed Plaintiff's validation packet.  (*Id.* at 9.)  As explained above, two source items were rejected because they did not meet the reliability requirements.  (*Id.* at 42.)  Based on the remaining three approved source items (June 18, 2008 and September 15, 2008 Confidential Memorandums; and September 17, 2008 CDCR-128-B), Plaintiff was validated as an AB member.  (*Id.* at 9.)

Because the most recently approved source item was dated September 17, 2008, Plaintiff will be eligible for active/inactive review after six years, which is on September 17, 2014.  (*Id.*)

On November 5, 2008, the CSATF IGI Unit received the CDCR-128B-2 for the OCS approving Plaintiff's validation as an AB prison gang member.  (Dkt. 7 at 48.)  On November 7, 2008, Plaintiff was notified by Corrections Officer Moreno that he had been validated, met the criteria for an indeterminate SHU term, and would remain in the Ad-Seg pending transfer to the SHU.  (Dkt. 7 at 9-10.)

On November 14, 2008, Plaintiff appeared before the CSATF ICC comprised of S. Sherman, Chief Deputy Warden of CSATF; T. Henne, Correction Officer for CDCR; and J. Cota, Correction Officer for CDCR.  (Dkt. 7 at 10.)  The committee informed Plaintiff that his administrative review was completed on November 10, 2008, by Correction Officer Fraunheim of the CDCR, and that Plaintiff would remain in Ad-Seg on "SHU status" and referred Plaintiff to the Classification Staff Representative ("CSR") for transfer to the SHU.  (Dkt. 7 at 10; Ganahl Decl. Ex. G.)  The CSR endorsed Plaintiff's indeterminate SHU term, and he was transferred to PBSP on December 15, 2008.  (Dkt. 7 at 11.)

On December 23, 2008, the PBSP Unit Classification Committee ("UCC") performed Plaintiff's initial review hearing and elected to retain Plaintiff on indeterminate SHU status due to his AB gang validation.  (Ganahl Decl. Ex. J.)

### D.     602 Inmate Appeals

On September 29, 2008, Plaintiff filed an Inmate/Parolee Appeal Form ("CDCR-602") claiming insufficient evidence and due process violations from the established policy.  (Dkt. 7 at 8.)  He requested a review and a revocation of the confidential information.  (*Id.*)  On October 25, 2008, Plaintiff filed a second CDCR-602 appealing his validation and lack of evidence and requesting the evidence be produced or rejected.  (*Id*. at 9.)  On October 29, 2008, Plaintiff filed a third CDCR-602 appealing the gang validation, SHU term, active prison gang validation, and SHU retention.  (*Id.*)

Plaintiff asserts the first CDCR-602 was not returned to him with a decision.  (*Id.* at 10.)  Additionally, Plaintiff asserts he made numerous attempts to have this appeal reviewed, but claims he was constantly told it was lost, sent to the wrong institution, submitted a duplicate, or too much time had elapsed since the underlying incident.  (*Id.* at 9-14.)

On November 3, 2008, the second CDCR-602 was returned as a duplicate request.  (*Id.*)

Meanwhile, Plaintiff's third CDCR-602 was bypassed at the informal, formal, and first level of review, and then it was denied at the second level of review on March 23, 2011.  (*Id.* at 91.)  According to the second level decision, no violation had occurred because the CDCR-1030s and confidential memorandums used in the gang validation package were within regulation and applicable policies.  (*Id.*)  On August 31, 2011, the third CDCR-602 was granted in part at the third level of review.  (*Id.* at 97.)  The reviewer explained that the June 18, 2008 Confidential Memorandum clearly identified Plaintiff as an active participant in AB gang activity.  (*Id*.)  However, the reviewer noted that the September 17, 2008 Confidential Memorandum that was provided to the Plaintiff, did not contain information that specifically identified the Plaintiff as being a part of the AB gang.  (*Id*.)  The reviewer required the prison staff at CSATF to have the IGI issue a new CDCR-1030 pertaining to the June 18, 2008 Confidential Memorandum, indicating the missing information that specifically linked Petitioner as a participant in the gang

activity associated with the AB.  (*Id.*)  The reviewer also certified that the aforementioned decision

(at the third level of review) exhausted administrative remedies available to Petitioner.  (*Id.* at

98.)[4]

### E.     Segregated Housing Status Review

Plaintiff concedes that his housing status is reviewed every six months.  (Dkt. 80 at 6.)

On June 2, 2009, Plaintiff participated in his 180 day review with the PBSP ICC.  (Ganahl

Decl. Ex. L)  Plaintiff expressed his opinion that he was not interested in debriefing, and did not

agree with his validation.  (*Id.*)  The committee determined that Plaintiff's validation met the

criteria under Title 15 of the California Code of Regulations § 3341.5(c)(5), and therefore opted to

retain Plaintiff in the SHU.  (*Id.*)

On October 7, 2009, Plaintiff had his annual housing review where he again voiced the

same concerns, and the committee again acted to retain Plaintiff in the SHU.  (Ganahl Decl. Exs.

M, N.)

On April 6, 2010, Plaintiff's housing status was reviewed by the UCC, and again, the

committee elected to continue Plaintiff's indeterminate SHU placement.  (Ganahl Decl. Ex. P.)

On September 8, 2010, Plaintiff's housing status was again reviewed by the ICC, and again

the committee elected to continue Plaintiff's indeterminate SHU term.  (Ganahl Decl. Ex. R.)

On March 8, 2011 and August 17, 2011, the UCC and ICC conducted their reviews,

respectively.  (Ganahl Decl. Exs. T-V.)  Both elected to retain Plaintiff in the SHU.  (*Id.*)  Plaintiff

refused to appear at the March 8, 2011 hearing.  (Ganahl Decl. Ex. T)

The UCC and ICC have since held hearings on Plaintiff's segregated housing status every

six months, and each time elected to retain Plaintiff in the SHU.  (Ganahl Decl. Ex. K.)

Plaintiff asserts that these reviews are meaningless because the committee simply uses the

same source items from his initial validation, which he contends, results in the review being

---

[4]  In order to exhaust available administrative remedies within this system, a prisoner must
proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a
CDC 602 inmate appeal form, (3) second level appeal to the institution head or designee, and
(4) third level appeal to the Director of the California Department of Corrections.  Cal. Code Regs.
tit. 15, § 3084.5; *Barry v. Ratelle*, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  This satisfies the
administrative remedies exhaustion under section 1997e(a)  *See id.* at 1237-38.

conducted in a rote and perfunctory manner.  (Dkt. 80 at 6; Dkt. 7 at 16.)  Therefore, Plaintiff argues that he is not being considered for release until his six year inactive review determination on September 14, 2014.  (Dkt. 7 at 16.)  Plaintiff maintains the only other option for release is debriefing, which Plaintiff claims is impossible because it requires him to divulge knowledge he does not possess.  (Dkt. 7 at 16, 42.)

### F.   Good Time Credits

Plaintiff explains that beginning in 2010, inmates in the SHU – including Plaintiff – have been denied the ability to earn good time credits.  (Dkt. 80 at 17.)  He argues such a denial "is not even arguably related to the 'administrative' rationale for segregating alleged gang members or associates."  (*Id.*)  Plaintiff contends that "[t]he post-2010 withholding of good time credit has made clear that SHU assignment is a punitive rather than administrative measure and entitles plaintiff to *Wolff*'s heighted process."  (*Id.* at 17-18) (citing *Wolff v. McDonnell*, 418 U.S. 539, 547 (1974).)  The Court will address this argument below.

## II.   MOTIONS TO COMPEL

Before the Court are Plaintiff's motions for an order compelling discovery.

Discovery may be taken in accordance with the Federal Rules of Civil Procedure.  No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16-1 is required before the parties may conduct discovery.  For Plaintiff's information, the proper manner of promulgating discovery is to send demands for documents or interrogatories (questions asking for specific, factual responses) directly to Defendants' counsel.  *See* Fed. R. Civ. P. 33-34.  The scope of discovery is limited to matters "relevant to the claim or defense of any party . . . .  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Discovery may be further limited by court order if "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2).

United States District Court
Northern District of California

1    It is not an effective or appropriate use of the Court's limited resources for it to oversee all

2    aspects of discovery.  Thus, before filing a motion to compel, the moving party must first attempt

3    to resolve the dispute informally with the opposing party.  It is only when the parties are unable to

4    resolve the dispute after making a good faith effort to do so should they seek the Court's

5    intervention.  *See* Fed. R. Civ. P. 37(a)(2)(B); N.D. Cal. Local Rule 37-1.  Because Plaintiff is

6    incarcerated, he is not required to meet and confer with Defendants in person.  Rather, if

7    Plaintiff's discovery requests are denied and he intends to pursue a motion to compel, he need

8    only send a letter to Defendants to that effect, offering them one last opportunity to provide him

9    the sought-after information.  The letter should state the specific discovery he seeks, and state the

10   reasons that Plaintiff believes he is entitled to such discovery.

11   Here, Plaintiff did not meet and confer with Defendants, which would have afforded them

12   with a final opportunity to address each request upon which he now asks the Court to rule.

13   Moreover, it may be that Plaintiff will obtain some sought-after discovery if Defendants file a

14   motion for summary judgment and accompanying exhibits, with which Defendants shall also serve

15   Plaintiff.  For these reasons, Plaintiff's motions to compel (docket nos. 54, 58) are DENIED as

16   premature.  The parties are directed to abide by the scheduling order to complete discovery

17   outlined below.

18   **III.    ANALYSIS OF MOTION FOR JUDGMENT ON THE PLEADINGS**

19   The following Defendants have filed a motion for judgment on pleadings claiming they are

20   entitled to judgment as a matter of law because Plaintiff does not connect them as being a

21   proximate cause to his claims: Office of Appeals Chief D. Foston, Appeals Examiner D. Van Leer,

22   Correctional Counselors D. Jacquez[5] and M. Markel, and Appeals Coordinator C. E. Wilber.  In

23   addition, Defendants CDCR Director Mathew Cate, Lieutenant R. Graves, and Wardens F. Jaquez

24   and G. D. Lewis claim they are entitled to judgment on the pleadings because they claim they

25   cannot be liable under a §1983 claim solely on the basis of supervisory liability.

26

27

28      [5] Defendant Jacquez is also known as "D. Vacquez."

### A.   Legal Standard

As an initial matter, this Court is required to liberally construe *pro se* pleadings. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

A Rule 12(c) motion for judgment on the pleadings may be brought at any time after the pleadings are closed, but within such time so as not to delay trial. Fed. R. Civ. P. 12(c). The standard applied to decide a Rule 12(c) motion is the same as the standard used in a Rule 12(b) motion to dismiss for failure to state a claim. Judgment on the pleadings is appropriate when, even if all material facts in the pleading are accepted as true, the moving party is entitled to judgment as a matter of law. *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993). For purposes of such a motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989). However, a court need not automatically accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *See Western Mining Council v. Watt, 643 F.2d 618, 624* (9th Cir. 1981). Although a court is generally confined to the allegations in the pleadings on a Rule 12(c) motion, a court may also consider documents whose contents are alleged in a complaint and whose authenticity no party questions. *See e.g., Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995) ("Such consideration does 'not convert the motion to dismiss into a motion for summary judgment.'").

### B.   Analysis

#### 1)   Proximate Cause

Defendants Foston, Markel, Vacquez, and Van Leer claim they are entitled to judgment as a matter of law because Plaintiff has failed to show that their actions proximately caused him harm. Specifically, they argue that Plaintiff "states no further facts whatsoever regarding these Defendants." Such an assertion is erroneous. A plaintiff must set forth facts proximately connecting the individual defendants to the loss the plaintiff claims to have suffered. *Leer v. Murphey*, 844 F.3d 628, 633 (9th Cir. 1988). Thus, to state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege facts showing defendants caused or personally participated in causing the

harm alleged in the amended complaint.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

### a.    Defendant Foston

Defendant Foston, as Chief of the Office of Appeals, is responsible for processing Plaintiff's CDCR-602s.  Plaintiff's act of naming Defendant Foston is liberally construed as an allegation that this Defendant allegedly caused Plaintiff's CDCR-602 (relating to his gang validation) to be erroneously decided.  (Dkt. 7 at 5.)  If true, then Defendant Foston would have proximately caused Plaintiff's continued SHU retention.  Therefore, the Court finds that Plaintiff states a valid claim against Defendant Foston.  Therefore, Defendant Foston is not entitled to judgment on the pleadings.

### b.    Defendant Markel

The record shows that Defendant Markel completed a review of Plaintiff's classification by filling out a CDCR-128-G; however, he did not notify Plaintiff that confidential information had been placed in his file.  (Dkt. 81 at 54, Ex. S)  Accordingly, Plaintiff argues Defendant Markel's actions prevented Plaintiff from effectively rebutting his AB validation.  Because Plaintiff has a right to timely notice of the charges against him, then such actions by Defendant Markel could have proximately caused Plaintiff to suffer a due process violation.  Accordingly, Plaintiff has alleged sufficient facts to state a claim against Defendant Markel.  Therefore, Defendant Markel is not entitled to judgment on the pleadings.

### c.    Defendant Jacquez

Plaintiff alleges that Defendant Jacquez reviewed the validation evidence and confirmed that Plaintiff was an associate of the AB.  (Dkt. 7 at 15.)  Defendant Jacquez's actions could have proximately caused Plaintiff's allegedly erroneous gang validation and contributed to the alleged due process violation.  Therefore, Defendant Jacquez is not entitled to judgment on the pleadings.

### d.    Defendant Van Leer

Plaintiff alleges that Defendant Van Leer, an Appeals Examiner, reviewed his CDCR-602s that related to the gang validation, thus putting this Defendant on notice of the due process violations.  (Dkt. 81 at 28, Ex. H)  If Defendant Van Leer was on notice that there was a due process violation and failed to correct it, then he would have contributed to the due process

United States District Court
Northern District of California

United States District Court
Northern District of California

1   violation asserted by Plaintiff.  Defendant Van Leer's failure to remedy the due process violation

2   could have proximately caused Plaintiff to suffer such a violation.  Therefore, Defendant Van Leer

3   is not entitled to judgment on the pleadings.

### e.   Defendant Wilber

5   Plaintiff concedes that he fails to state a claim for relief against Defendant Wilber because

6   he was not involved in furthering the alleged due process violations.  (Dkt. 84 at 1.)  Accordingly,

7   all claims against Defendant Wilber are DISMISSED.

### 2)   Supervisory Liability

9   Defendants Cate, Graves, Jaquez, and Lewis claim they are entitle to judgment on the

10  pleadings because they cannot be liable under a §1983 claim solely on the basis of respondeat

11  superior.

12  A person deprives another of a constitutional right within the meaning of section 1983 if he

13  does an affirmative act, participates in another's affirmative act, or omits to perform an act which

14  he is legally required to do, that causes the deprivation of which the plaintiff complains.  *See Starr*

15  *v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (supervisor liability under section 1983 requires

16  personal involvement in constitutional deprivation or sufficient causal connection between

17  supervisor's wrongful conduct and constitutional deprivation).  Supervisor defendants are entitled

18  to qualified immunity where the allegations against them are simply "bald" or "conclusory"

19  because such allegations do not "plausibly" establish the supervisors' personal involvement in

20  their subordinates' constitutional wrong.  *Ashcroft v. Iqbal*, 556 U.S. 662, 675-84 (2009) (noting

21  no vicarious liability under Section 1983 or *Bivens* actions).  So it is insufficient for a plaintiff

22  only to allege that supervisors knew about the constitutional violation and that they generally

23  created policies and procedures that led to the violation, without alleging "a specific policy" or a

24  "specific event" instigated by them that led to the constitutional violations.  *Hydrick v. Hunter*,

25  669 F.3d 937, 942 (9th Cir. 2012).

### a.   Defendants Cate and Jaquez

27  Plaintiff alleges that Defendant Cate and Defendant Jaquez allowed the alleged custom of

28  meaningless reviews to continue, which Plaintiff alleges violates his due process rights.  Plaintiff

14

argues that Defendants Cate and Jaquez are responsible for the discipline and discipline regulations of all inmates and accordingly should have created better procedures.  (Dkt. 80 at 16.) Plaintiff did not allege "a specific policy" or a "specific event" instigated by either Defendant that led to the constitutional violations.  Therefore, Plaintiff is only alleging that Defendant Cate and Jaquez generally created policies and procedures that led to the violation.  Plaintiff has not stated sufficient facts to impose supervisory liability on Defendants Cate and Jaquez.  *See Hydrick*, 669 F.3d at 942.  Defendants Cate and Jaquez are entitled to judgment on the pleadings because Plaintiff failed to establish specific acts to connect them to his alleged due process violation.  Accordingly, all claims against Defendants Cate and Jaquez are DISMISSED.

### b.    *Defendant Graves*

The Court finds unavailing Defendant Graves's claim that he cannot be liable solely based on his supervisory role as a facility captain.  To the contrary, Plaintiff specifically claims that Defendant Graves filled out a 180-day review form regarding Plaintiff's continued SHU retention but failed to notify him that material was placed in the confidential folder by way of a CDCR-1030 form.  (Dkt. 81 at 56, Dkt. 80 at 31.)   Plaintiff asserts that this action denied him adequate notice of the charges against him, thereby violating his right to due process.  (*Id.*)  This is an affirmative act, and, if true, it could state a claim for a due process violation.  Accordingly, Defendant Graves is not entitled to judgment on the pleadings.

### c.    *Defendant Lewis*

Plaintiff claims that Defendant Lewis contributed to Plaintiff's due process violation because he must have learned of the due process violations but failed to correct them in the course of his supervisory responsibilities.  (Dkt. 80 at 32-33.)  Specifically, Defendant Lewis reviewed Plaintiff's CDCR-602 at the second level of review and denied it upon finding that the validation items were produced within the CDCR policies and regulations.  (Dkt. 81 at 23-24, Ex. G.) Similar to Plaintiff's claim against Defendant Van Leer above, if Defendant Lewis was on notice that there was a due process violation and failed to correct it, then he would have contributed to the due process violation.  Therefore, Defendant Lewis is not entitled to judgment on the pleadings.

**IV.    ANALYSIS OF MOTION FOR SUMMARY JUDGMENT**

Defendants additionally assert they are entitled to summary judgment on the remaining claims because: (1) Plaintiff received all the due process required for his placement in the SHU; (2) Plaintiff's state law claims failed to comply with the California Government Claims Act; and (3) they are entitled to qualified immunity.

**A.    Legal Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See id.*

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Id.*  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  *See Liberty Lobby*, 477 U.S. at 249-50.  However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory." *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Liberty*

1  *Lobby*, 477 U.S. at 248.  If the nonmoving party fails to make this showing, "the moving party is

2  entitled to a judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

3         At summary judgment, the judge must view the evidence in the light most favorable to the

4  nonmoving party: if evidence produced by the moving party conflicts with evidence produced by

5  the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving

6  party with respect to that fact.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).  A

7  court may not disregard direct evidence on the ground that no reasonable jury would believe it.

8  *See id.* (where the nonmoving party's direct evidence raises genuine issues of fact but is called

9  into question by other unsworn testimony, the district court may not grant summary judgment to

10  the moving party on the ground that direct evidence is unbelievable).  The district court may not

11  resolve disputed issues of material fact by crediting one party's version of events and ignoring

12  another.  *Wall v. County of Orange*, 364 F.3d 1107, 1111 (9th Cir. 2004).  "By deciding to rely on

13  the defendants' statement of fact [in deciding a summary judgment motion], the district court

14  became a jury."  *Id.*  But, "[w]hen opposing parties tell different stories, one of which is blatantly

15  contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

16  version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*,

17  550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified

18  immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade

19  capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent

20  bystanders).

21         **B.   Evidence Considered**

22         A district court may only consider admissible evidence in ruling on a motion for summary

23  judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

24  In support of Defendants' motion for summary judgment, declarations, and exhibits have been

25  filed by Defendant Fischer, Lead Attorney of Record Erin C. Ganahl, and IGI Assistant Furlong.

26  Defendants have also submitted four confidential gang investigation memoranda and their

27  attachments, and the confidential validation disclosure worksheet, which are attached as Exhibits

28  B through E to IGI Assistant Furlong's declaration, and Exhibit B to the Defendant Fischer's

declaration.  Defendants have requested that each of these documents and the information

contained therein be sealed and reviewed *in camera*.  As explained above, the Court will enter

separately the protective order proposed by Defendants.

Additionally, Plaintiff verified his complaint by signing it under "penalty of perjury" on

December 12, 2011.  On January 24, 2014, Plaintiff submitted an opposition to Defendants'

motion for summary judgment and a declaration in support of his opposition signed under

"penalty of perjury" on January 12, 2014.  (Dkt. 81).  Plaintiff also submitted a declaration of R.

Barajas in support of his opposition (Dkt. 82), also signed under "penalty of perjury."  Therefore,

for the purposes of this Order, the Court will treat Plaintiff's complaint, opposition to summary

judgment, and his declaration as affidavits under Rule 56 of the Federal Rules of Civil Procedure.

*See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

## C.   Due Process Claim

Plaintiff claims he was denied due process because Defendants should have used *Wolff*

procedures to confirm the gang validation.  Plaintiff argues that SHU assignment is "punitive"

(i.e., for disciplinary reasons), and not administrative.  He further argues that prison officials did

not have sufficient evidence to validate Plaintiff as a member of the AB prison gang, and

Defendants failed to provide timely and adequate notice of the evidence against him.  (Dkt. 7 at

21-22; Dkt. 80 at 30.)

### 1)   Applicable Legal Standard

Courts use a two-step inquiry to determine whether a plaintiff has stated a valid procedural

due process claim.  *See Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

First, the court asks whether the plaintiff has alleged a deprivation of a legally cognizable

interest – that is, "whether there exists a liberty or property interest which has been interfered with

by the State."  *Id.*

Second, if the court finds that a plaintiff has alleged such a deprivation, it will then proceed

to the next stage of the inquiry, asking "whether the procedures attendant upon that deprivation

were constitutionally sufficient."  *Id*.

The Supreme Court has held, and Defendants do not challenge, that inmates considered for

18

1    placement in a maximum security facility have a legally cognizable liberty interest under the due

2    process clause.  *See Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005) (recognizing inmates have a

3    liberty interest in avoiding assignment to a supermax unit that disqualifies them for parole and

4    imposes "severe limitations on all human contact" for an "indefinite" period of time).  Therefore,

5    this motion turns on the *second* step: whether the procedures of the CDCR to assign inmates to the

6    SHU are constitutionally adequate.

7           The Supreme Court has twice addressed the amount of due process that the Constitution

8    affords inmates with protected liberty interests in *Wolff* and *Hewitt*.

9           In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court considered the process

10   required before a prison official can punish an inmate for serious misconduct after incarceration.

11   Although the specific sanction at issue was denial of "good-time" credits, *Wolff* applies equally

12   where the sanction is disciplinary segregation in the SHU.  *Id*. at 571, n.19; *Toussaint IV v.*

13   *McCarthy*, 801 F.2d 1080, 1099 (1986), *abrogated in part on other grounds by Brown v. Oregon*

14   *Dept. of Corrections,* 751 F. 3d 983, 989 (2014).  After balancing the competing interests at stake,

15   the Supreme Court held that the inmate in *Wolff* was entitled to the following due process

16   protections: (1) advance written notice of the disciplinary charges, (2) an opportunity to call

17   witnesses and present evidence if doing so would not unduly jeopardize institutional safety or

18   correctional goals, (3) assistance from another inmate or prison staff if the inmate is illiterate or

19   the complexity of the issues makes it difficult to collect and present the evidence necessary for an

20   adequate comprehension of the case, and (4) a written decision and summary of the evidence

21   relied on.  *Wolff*, 418 U.S. at 563-70.  The prison was not, however, required to permit the cross-

22   examination of witnesses or the participation of counsel.  *Id*. at 567-69.

23          In *Hewitt v. Helms*, 459 U.S. 460 (1995), the Supreme Court considered the amount of

24   process required before the state can transfer an inmate to a SHU for "administrative" reasons.

25   *Hewitt v. Helms*, 459 U.S. 460 (1995), *receded from on other grounds by Sandin v. Conner*, 515

26   U.S. 472, 482-83 (1995).  This type of "administrative segregation" is not utilized to punish the

27   inmate for specific misconduct, as was the case in *Wolff*, but to further some legitimate need of the

28   prison.  *Taylor v. Koon*, 682 F.Supp. 475, 477 (D. Nev. 1988).  Thus, administrative segregation

United States District Court
Northern District of California

19

may properly be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates or to await completion of an investigation into misconduct charges. *Hewitt*, 459 U.S. 460, 468, 476-77; *Toussaint IV*, 801 F.2d at 1098. The Supreme Court held that the amount of process required in cases of administrative segregation is substantially less than that required in *Wolff*-type proceedings. *Hewitt*, 459 U.S. at 473-476. As the Ninth Circuit summarized:

> Due process, in the administrative context, merely requires that the prison officials provide the inmate with some notice of the charges against him and an opportunity to present [the inmate's] views to the prison official charged with deciding whether to transfer [the inmate] to administrative segregation.

*Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).

Thus, under *Wolff* and *Hewitt*, the amount of process due depends, in significant part, on whether the prisoner's transfer to the SHU is characterized as disciplinary or administrative. The Ninth Circuit has determined that a prisoner's transfer to the SHU is *administrative*. *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986). Accordingly, inmates are entitled to the following minimal procedural requirements: prison officials must hold an informal hearing within a reasonable time after the prisoner is segregated, the prisoner must be informed of the reason segregation is being considered, and the prisoner must be allowed to present his views. *Id.*

Again, as explained above, in his opposition to Defendants' motion for summary judgment, Plaintiff asserts that inmates assigned to the SHU should be entitled to *Wolff*'s protections because a SHU assignment is actually a *disciplinary* action and not an administrative decision. (Dkt. 80 at 18.) Additionally, Plaintiff also argues that the *Wilkinson* procedures are inapplicable because these procedures are based on reassignment for administrative reasons. Such an argument is contrary to the established law in the Ninth Circuit. Previously, the Ninth Circuit has held that the lower *Hill* and *Wilkinson* due process standards apply to SHU assignment decisions:

> [*Hill*] standard, and not the heightened standard of *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), applies to this case because California's policy of assigning suspected gang affiliates to the Security Housing Unit is not a disciplinary measure, but an administrative strategy designed to

preserve order in the prison and protect the safety of all inmates.

*Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003).  However, Plaintiff asserts that reassignment to the SHU is actually a "punitive" action.  Plaintiff supports this conclusion with the recent decision by the CDCR to prevent inmates in the SHU from receiving good time credits, which Plaintiff asserts "is not even arguably related to the 'administrative' rationale for segregating alleged gang members or associates."  (Dkt. 80 at 17.)

A review of Supreme Court decisions regarding procedural process in prisons does indicate that the loss of good time credits is a punitive measure (related to disciplinary reasons) that changes the due process analysis.  For example, in *Wilkinson*, the case on which Defendants heavily rely for their due process argument, the Supreme Court explained that Ohio's supermax facility is reassigning inmates for administrative reasons; therefore, they are not entitled to higher procedural protections.

> Ohio is not, for example, attempting to remove an inmate from free society for a specific parole violation, *see, e.g., Morrissey*, 408 U.S., at 481, 92 S. Ct. 2593, or to revoke good-time credits for specific, serious misbehavior, *see, e.g., Wolff*, 418 U.S., at 539, 94 S. Ct. 2963, where more formal, adversary-type procedures might be useful.

*Wilkinson*, 545 U.S. at 229.

However, here in the instant case, California is revoking good-time credits for inmates who are housed in the SHU, which the Supreme Court implies requires more adversarial procedures.  *Wolff* itself is also instructive, there the Supreme Court explained: "[t]he deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance."  *Wolff*, 418 U.S. at 561.  Therefore, it is possible that California's decision to revoke good time credits has converted SHU assignment into a punitive measure (i.e., for disciplinary reasons) requiring more due process protections.

Additionally, Defendants argue that SHU assignment is still an *administrative* decision. (Dkt. 87 at 12.)  Defendants claim that Plaintiff's gang validation occurred in 2008; therefore, even if the 2010 changes to the penal code caused a change in the due-process standard, it would

1    not have impacted Plaintiff's validation.  (*Id.*)  However, it is important to note that Plaintiff is not

2    only challenging his initial validation, he is challenging the entire review process.  Therefore, if a

3    trier of fact decided that the denial of good time credits caused SHU placements to be for

4    *disciplinary* reasons then they could determine that Plaintiff would be entitled to *Wolff* procedures

5    for his continued retention in the SHU.  Therefore, this Court need not address at this time whether

6    Plaintiff should be entitled to *Wolff* procedures for reassignment to the SHU.  Instead, the Court

7    will resolve whether there Defendants would be entitled to summary judgment under the current

8    framework established in *Wilkinson*.

9           When the Supreme Court most recently looked at assigning inmates to a supermax facility

10   in Ohio (similar to the SHU) in *Wilkinson*, the Court applied the factors from *Mathews v. Eldridge*

11   to determine if the procedures used to assign inmates to the supermax facility complied with due

12   process requirements.  *Wilkinson*, 545 U.S. at 224-25.  Under the *Mathews* test, the court must

13   weigh: (1) the "private interest that will be affected" by the challenged government action; (2) "the

14   risk of an erroneous deprivation of such interest" under current procedures and the "probable

15   value, if any, of additional or substitute procedural safeguards"; and (3) the "[g]overnment's

16   interest" in the official action, including the cost of providing additional procedures.  *Mathews v.*

17   *Eldridge*, 424 U.S. 319, 335 (1976).

18          Additionally, the Ninth Circuit has held that administrative segregation determination must

19   be made on the basis of "some evidence."  *Bruce*, 351 F.3d at 1287-88 (noting that a sheriff's

20   department report that the prisoner was a gang member, a probation report that prisoner's co-

21   defendant was a gang member, or a statement from a prison informant would constitute "some

22   evidence").  The standard for "some evidence" is not high, this Court need only decide whether

23   there is any evidence at all that could support the prison officials' administrative decisions.  *Id.* at

24   1287.

25                **2)    Analysis**

26                   ***a.    Due Process Procedures***

27          As an initial matter, Defendants do not challenge the position that inmates considered for

28   placement in the SHU have a legally cognizable liberty interest under the due process clause, in

1    not being placed in the SHU.  *See Wilkinson*, 545 U.S. at 223-24; Dkt. 70 at 24.  Therefore, the

2    first prong of the due process analysis is satisfied.

3            Defendants argue they are entitled to summary judgment on Plaintiff's due process claim

4    because Plaintiff received "minimal process to which he was entitled."  (Dkt. 70 at 17.)

5    Defendants further explain that Plaintiff received the process which was outlined in *Wilkinson,* the

6    current legal framework for maximum security prisons.  (*Id.* at 25.)

7            To determine whether the current CDCR procedures for assigning inmates to the SHU are

8    constitutionally adequate, this Court applies the *Mathews* test.  *See Wilkinson*, 545 U.S. at 224-25.

### i.  First *Mathews* Factor

10           While the Court recognizes that the first *Mathews* factor, the private interest at stake, is

11   ordinarily given less weight "within the context of the prison system and its attendant curtailment

12   of liberties," *Wilkinson*, 545 U.S. at 225, this case presents unique circumstances, given the length

13   and deprivations alleged.  Plaintiff has already spent a long period of time in the SHU – six years

14   this December.  (Dkt. 70 at 18.)  This six-year period is significantly longer than any of the

15   *Wilkinson* plaintiffs were alleged to have spent in Ohio's supermax facility, which was only four

16   years old when that case was filed.  Additionally, Plaintiff here claims that he has almost no

17   human contact and is deprived of basic items such as training programs, work, education, religious

18   services, and hobbies.  (Dkt. 7 at 19-20.)  Plaintiff asserts that being housed in this environment

19   has caused him to suffer from vision impairment, frequent headaches, and psychological damage

20   requiring him to take Propranolol (a drug used to treat hypertension, anxiety, and panic attacks).

21   (Dkt. 7 at 20.)  Taken as a whole, the private interest at stake, in not being housed in the SHU, is

22   quite significant and therefore, this factor weighs in favor of Plaintiff.

### ii.  Second *Mathews* Factor

24           Turning to the second factor – "risk of erroneous deprivation" – Plaintiff alleges that the

25   current gang validation procedures create an "overwhelming risk of erroneous deprivation and

26   arbitrary and discriminatory validations."  (Dkt. 80 at 20.)

27           In *Wilkinson*, the Supreme Court held that Ohio's procedures for assigning inmates to its

28   only supermax prison, satisfied the due process requirement of *Mathews*.  The Supreme Court's

United States District Court
Northern District of California

United States District Court
Northern District of California

decision emphasized that Ohio's reassignment process includes numerous measures to help ensure that inmates are not erroneously assigned to the supermax facility. *See Wilkinson*, 545 U.S. at 224-29. First, Ohio's reassignment decision is based on a form detailing "matters such as the inmate's recent violence, escape attempts, gang affiliation, underlying offense, and other pertinent details." *Id*. at 216. Second, the Supreme Court specifically noted that Ohio provides multiple levels of review for any decision to further reduce the risk of erroneous placement. *Id*. at 227. Third, the Supreme Court also highlighted that the decisionmaker provides a short statement of reasons for their placement decision, which provides the inmate a basis for objection before the next decisionmaker or in a subsequent classification review. *Id*. at 226. Finally, the Supreme Court also noted that inmates in the supermax facility are entitled to the same multi-tiered review process each year that they remain there. *Id.* at 217.

In comparison, the CDCR's reassignment procedures relating to PBSP's SHU assignments comprise significantly fewer protections than those procedures relating to assignments at Ohio's supermax facility.  Plaintiff asserts that PBSP's SHU assignment is based on behavior that is "nominal, passive, inactive or purely technical. . . ." (Dkt. 80 at 20.)  First, Plaintiff argues that his placement in the SHU, unlike Ohio's procedure, is not based on any individualized finding that he posed any real threat to the safety of others or institutional security. (Dkt. 7 at 17.)  Plaintiff asserts that once he was validated, he was automatically deemed a severe threat. (Dkt. 80 at 27.) This is supported by CDCR-128-G dated September 25, 2008, regarding his segregated housing status which stated: "[t]here exists no pattern of in-cell violence or predatory behavior towards cellmates. . . ." (Ganahl Decl. Ex. D.) Second, according to Plaintiff, one of his AB gang validation appeals was never returned to him. (Dkt. 7 at 10.) This seriously calls into question Defendants' assertion that a multi-tiered review process for placement in the SHU is working to reduce the risk of erroneous placement. Third, contrary to Ohio's procedures which ensure that inmates receive all necessary information to rebut their validation; as mentioned above, Plaintiff contends that he was not provided adequate or complete information to rebut the IGI's evidence. Finally, Ohio's annual multi-tiered review process is not present at PBSP's SHU. Plaintiff argues that the committee reviews are held in a "rote and perfunctory manner." (Dkt. 7 at 16.)

1    Additionally, Plaintiff asserts that the six-month reviews are meaningless because it is a single

2    review that is not evaluated by anyone outside the department, and the same evidence is used to

3    retain him in the SHU.  (Dkt. 7 at 16; Dkt. 80 at 28.)   In fact, according to Plaintiff, the only way

4    inmates can realistically secure release from the SHU is to debrief, an option which many inmates

5    are reluctant to exercise for fear of their safety.  (*Id.*)  And as the Supreme Court recognized in

6    *Wilkinson*: "Testifying against, or otherwise informing on, gang activities can invite one's own

7    death sentence."  *Wilkinson*, 545 U.S. at 227.  Taken together, CDCR's procedures at PBSP

8    (asserted by Plaintiff) create a much greater "risk of erroneous deprivation" (the second *Mathews*

9    factor) than was present in *Wilkinson*.  Therefore, this second factor weighs in favor of Plaintiff.

### iii.  Third *Mathews* Factor

11        The third *Mathews* factor also weighs slightly in Plaintiff's favor because the costs of

12    providing additional safeguards, such as a more adversarial procedure for validation, more detailed

13    information for initial validation, and more detailed review process, would be relatively small.

14    PBSP's SHU currently houses 1,179 inmates,[6] which constitutes only a small fraction of

15    California's total inmate population.  Amending the procedural protections afforded to this subset

16    of inmates, who are facing lengthy and severe deprivations, would be considerably easier and

17    cheaper than affording new protections to the inmate population as a whole.

### iv.  Summary

19        As such, all *Mathews* factors at least partially lean towards Plaintiff.  Therefore, taking the

20    evidence viewed in a light most favorable to Plaintiff, the nonmoving party, a reasonable fact

21    finder could determine that CDCR's procedures do not sufficiently protect inmates rights to due

22    process when being reassigned to the SHU.

23        Accordingly, Defendants are not entitled to summary judgment because there is a disputed

24    issue of material fact about whether or not Plaintiff's due process rights were violated.

---

[6] This is the current number of inmates listed on the CDCR's website for PBSP institution statistics as of 7/22/2014.  Available at http://www.cdcr.ca.gov/Facilities_Locator/PBSP-Institution_Stats.html

United States District Court
Northern District of California

### b.   *Adequate Notice Requirement*

Defendants claim that Plaintiff does not challenge the adequate notice requirement but only challenges that he was not given timely notice of placement of confidential information in his file of the CDCR-1030. (Dkt. 70 at 26.)  However, this is not so – in fact, Plaintiff has raised a claim of insufficient notice regarding his validation.  Specifically, in his complaint, Plaintiff claimed a Fourteenth Amendment violation due to Defendants' "Failure to notify [Plaintiff] by way of a CDCR-1030 that confidential information was placed into his file and reviewed." (Dkt. 7 at 21.)  Plaintiff clarified this argument in his opposition to Defendants' motion for summary judgment by explaining he was not given timely notice of when confidential information was placed in his file so that he could contest that information immediately rather than several months or years after disclosure. (Dkt. 80 at 30.)   Therefore, Plaintiff has alleged a lack of timely notice for his gang validation charges.

Defendants assert that Plaintiff is only entitled to receive minimal procedural requirements: an informal hearing within a reasonable time after the prisoner is segregated, notice of the reason segregation is being considered, and the prisoner must be allowed to present his views before his validation.  *See Toussaint*, 801 F.2d at 1100.  Defendants claim that Plaintiff received notice and had an opportunity to present his views at a hearing before his validation; therefore, Defendants claim, due process requirements were met. (Dkt. 87 at 14.)  Plaintiff asserts that because he did not receive timely notice of the CDCR-1030s, there was a chilling effect and he was unable to properly present his views. (Dkt. 7 at 21.)  Plaintiff argues that there is a disputed issue of material fact regarding whether he received adequate notice in order for him to present his views to the prison officials.  *See Bruce,* 351 F.3d at1287.  Plaintiff asserts that he did not receive timely notice of this information because he was not immediately notified when these items were placed in his file.  Plaintiff further explained as follows:

> Plaintiff reviewed his central prison file during a requested review.
> He received a CDCR Form 810 'Confidential Information Listing.'
> (Plnt. Decl. Ex. J)  This form is to inform [P]laintiff that the listed
> documents have been classified as confidential for reasons stated
> and cannot be reviewed.  When Plaintiff received a copy of this
> form from his counselor he noticed several items he had no
> knowledge of and had not received a CDCR-1030 'Confidential

> Information Disclosure Form.'  This form is to disclose enough
> information for an inmate to defend himself against the allegation,
> without endangering safety and security of the institutions, when
> officials are using this confidential information in any decision
> making process.  Plaintiff was not given timely notice of when
> confidential information was placed in his file so that he could
> contest that information immediately rather than several months or
> years after disclosure.

(Dkt. 80 at 30.)

Plaintiff indicates two other issues with the information that was disclosed to him prior to his validation hearing.  First, Plaintiff states that not all information from the June 18, 2008 confidential memorandum was disclosed to him because Assistant IGI Furlong's declaration references multiple "letters" and only one letter was disclosed to Plaintiff.  (Dkt. 83 at 4; Furlong Decl. at 5.)  Furthermore, the third level of review was granted in part because the information provided to Plaintiff regarding the June 18, 2008 Confidential Memorandum did not contain information that specifically identified the Plaintiff as being a part of the aforementioned gang activity.  (Dkt. 7 at 97.)   Plaintiff argues that the unwarranted delays in notification of these memorandums have a chilling effect on Plaintiff's ability to marshal the facts and prepare a defense against the charges.  (Dkt. 80 at 31.)

Title 15 of the California Code of Regulations § 3378 requires at least three independent source items of documentation indicative of actual gang membership to validate an inmate.  As explained above, five items were originally submitted to support Plaintiff's validation, but only three were accepted.  As noted, there were multiple issues with the June 18, 2008 Confidential Memorandum, enough that the decision at the third level of review required the reissuance of a new CDCR-1030 regarding that source item.  Although the response at this level of review believed that it rectified the problem by reissuing a new CDCR-1030, this does not resolve the due process notice requirement.  If Plaintiff did not have this information at the time of his original validation hearing, then a reasonable trier of fact could find that Plaintiff did not receive adequate notice of the charges against him.  If Plaintiff did not receive adequate notice, a trier of fact could conclude that there was a due process violation, therefore it is a material issue.  *See Toussaint*, 801 F.2d at 1100.  Because a reasonable trier of fact could find that Plaintiff did not receive adequate

1   notice of the charges against him, this is a disputed issue of material fact that cannot be resolved at

2   this stage of the proceedings.  Accordingly, Defendants are not entitled to judgment as a matter of

3   law on this aspect of their motion for summary judgment.

4               c.      "Some Evidence" Requirement

5        The next relevant issue is whether there was "some evidence" to support Plaintiff's

6   gang validation.  *Toussaint*, 801 F.2d at 1099.  Defendants argue that the items used to validate

7   Plaintiff met *Hill's* "some evidence" requirement.  Under *Hill*, courts do not examine the entire

8   record, independently assess witness credibility, or reweigh the evidence; rather, "the relevant

9   question is whether there is any evidence in the record that could support the conclusion."

10  *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985).

11       In light of the disputed issue of material fact regarding whether Plaintiff was received

12  adequate notice of the evidence used to validate him and place him in administrative segregation,

13  any substantive analysis of whether the evidence used to validate plaintiff carries the required

14  "indicia of reliability" is moot at this stage of the proceedings.  Therefore, the Court need not

15  conduct an analysis of whether there was "some evidence" to support Plaintiff's gang validation.

16       **D.   State Law Claims**

17            **1)   Applicable Legal Standard**

18       When adjudicating a supplemental state law claim, the federal courts must apply state

19  substantive law.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  The CTCA

20  requires that a tort claim against a public entity or its employees be presented to the California

21  Victim Compensation and Government Claims Board, formerly known as the State Board of

22  Control, no more than six months after the cause of action accrues.  *See* Cal. Gov't Code §§ 905.2,

23  910, 911.2, 945.4, 950-950.2.  Presentation of a written claim and action on, or rejection of, the

24  claim are conditions precedent to a suit.  *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d

25  1470, 1477 (9th Cir. 1995).

26            **2)   Analysis**

27       Plaintiff alleges that Defendants violated his due process rights under Article 1, Sections 7

28  and 15 of the California Constitution.  (Dkt. 7 at 23.)   Plaintiff additionally asserts that

1  Defendants violated their mandatory duties by violating several state regulations.  Defendants

2  assert that Plaintiff has failed to comply with the California Government Claims Act.  The

3  California Government Claims Act provides that a claim relating to an injury to a person must be

4  presented no later than six months after the accrual of the cause of action.

5  Defendants request the court to take judicial notice of records from the Board confirming

6  that Plaintiff did not file a timely claim regarding his state law causes of action against any of the

7  defendants named in this case.  (Dkt. 74.)  However, Plaintiff concedes that he failed in filing a

8  claim with the Government Claims Board and therefore voluntarily waived his "government law"

9  claims.  (Dkt. 84 at 1.)

10  Accordingly, Plaintiff's state law claims are DISMISSED.

11  **E.    Eleventh Amendment Immunity and Qualified Immunity**

12  **1)    Applicable Federal Law**

13  Defendants argue they are entitled to summary judgment because they claim even if there

14  was a due process violation, they are each entitled to Eleventh Amendment Immunity or qualified

15  immunity.  The Supreme Court in *Hafer v. Melo* described the difference between official capacity

16  and personal capacity suits.  "[T]he phrase 'acting in their official capacities' is best understood as

17  a reference to the capacity in which the state officer is sued, not the capacity in which the officer

18  inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  An official sued in his official

19  capacity has the same immunity as the state, and is entitled to Eleventh Amendment Immunity.

20  *Id*. at 25-26.  An official sued in his personal capacity, although deprived of Eleventh Amendment

21  Immunity, may assert a defense of qualified immunity.  *Id*.

22  For Eleventh Amendment Immunity, the Supreme Court has noted one important

23  exception, however: a state official may be sued in his official capacity under section 1983 for

24  prospective injunctive relief from unconstitutional state action.  *See Will v. Michigan Dep't of*

25  *State Police*, 491 U.S. 58, 71 n.10 (1989); *Wolfe v. Strankman*, 392 F.3d 358, 364 (9th Cir. 2004);

26  *see also Cerrato v. San Francisco Community College Dist*., 26 F.3d 968, 972-73 (9th Cir. 1994)

27  (section 1983 does not bar federal court from granting prospective injunctive relief against officer

28  of state acting outside bounds of authority).

1    Alternately, personal-capacity suits seek to impose individual liability upon a government

2    officer for actions taken under color of state law. Thus, "[o]n the merits, to establish personal

3    liability in a § 1983 action, it is enough to show that the official, acting under color of state law,

4    caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The

5    defense of qualified immunity protects "government officials . . . from liability for civil damages

6    insofar as their conduct does not violate clearly established statutory or constitutional rights of

7    which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

8    A court considering a claim of qualified immunity must determine whether the plaintiff has

9    alleged the deprivation of an actual constitutional right and whether the right was clearly

10   established, such that it would be clear to a reasonable officer that his conduct was unlawful in the

11   situation he confronted.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The relevant,

12   dispositive inquiry in determining whether a right is clearly established is whether it would be

13   clear to a reasonable officer that her conduct was unlawful in the situation confronted.  *Saucier v.*

14   *Katz*, 533 U.S. 194, 202 (2001).

15   "Qualified immunity is only an immunity from a suit for money damages, and does not

16   provide immunity from a suit seeking declaratory or injunctive relief." *Hydrick v. Hunter*, 669

17   F.3d 937, 939-40 (9th Cir. 2012) (granting immunity on claims for money damages against

18   supervisor defendants, but allowing claims for declaratory and injunctive relief to proceed); *Henry*

19   *A. v. Willden*, 678 F.3d 991, 999 (9th Cir. 2012) (qualified immunity unavailable as defense where

20   defendant is municipality or where injunctive relief is sought instead of or in addition to damages).

21   Prison officials and correctional officers are not entitled to absolute immunity.  *See Procunier v.*

22   *Navarette*, 434 U.S. 555, 561 (1978).  Members of prison disciplinary committees are also not

23   entitled to absolute immunity.  *See Cleavinger v. Saxner*, 474 U.S. 193, 206 (1985).

24          **2)    Analysis**

25                  ***a.    Eleventh Amendment Immunity***

26   Because Plaintiff is seeking injunctive relief against state officials in their official capacity,

27   Defendants are not entitled to Eleventh Amendment Immunity.  As explained above, Eleventh

28   Amendment Immunity does not provide immunity from a suit seeking declaratory or injunctive

United States District Court
Northern District of California

30

1    relief. *See Will*, 491 U.S. at 71 n.10.

2         Accordingly, Plaintiff's claims against Defendants in their official capacity for injunctive

3    relief are valid, and they are not entitled to immunity on this ground.

4                              *b.    Qualified Immunity*

5         Similarly, Defendants are not entitled to qualified immunity for Plaintiff's suit against

6    them in their personal capacity at this time.  As discussed above, Plaintiff's right to receive notice

7    of the charges against him prior to his hearing was clearly established in 2008.  *See Toussaint*, 801

8    F.2d at 1100 (holding that prison officials must inform the prisoner of the charges against the him

9    or her, the reasons for considering segregation, and allow the prisoner to present his or her views).

10   A court determining whether a right was clearly established looks to "Supreme Court and Ninth

11   Circuit law existing at the time of the alleged act."  *Community House, Inc. v. Bieter*, 623 F.3d

12   945, 967 (9th Cir. 2010).  Because *Toussaint* was decided in 1986, the right to adequate notice for

13   placement in Ad-Seg or the SHU was clearly established when Plaintiff was validated in 2008.

14        Defendants also contend they entitled to qualified immunity because even if the right was

15   clearly established, their conduct was reasonable.  However, whether a prison official acted

16   reasonably is a mixed question of law and fact: "[i]t involves an objective test of whether a

17   reasonable official could have believed that his conduct was lawful in light of what he knew and

18   the action he took."  *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th

19   Cir. 1995).  Because the decision relating to his CDCR-602 at the third level of review stated that

20   Plaintiff did not receive the information that directly linked him to the piece of evidence, there is

21   some indication that Plaintiff was not given sufficient information.  Therefore, viewed in the light

22   most favorable to Plaintiff, a genuine issue of material fact exists as to whether or not Defendants

23   provided Plaintiff with sufficient information to defend himself from the allegation.  Importantly,

24   this issue cannot be decided as a matter of law at this stage in the proceedings.

25        In sum, Defendants are not entitled to Eleventh Amendment Immunity or qualified

26   immunity for Plaintiff's due process claim against them in their official or personal capacities.

27                                    **CONCLUSION**

28        For the reasons stated above,

United States District Court
Northern District of California

31

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motions to compel discovery are DENIED without prejudice.  (Dkt. 54, 58.)

2.      Defendants' Motion to Seal will be GRANTED in a separate Order.  (Dkt. 69.)

3.      Defendants' Motion for Judgment on the Pleadings for Defendants Foston, Markel, Jacquez, Van Leer, Lewis, and Graves is DENIED.

4.      Defendants' Motion for Judgment on the Pleadings for Defendants Wilber, Cate, and Jaquez is GRANTED.  All claims against Defendants Wilber, Cate, and Jaquez are DISMISSED.

5.      Defendants' Motion for Summary Judgment on Plaintiff's due process claim is DENIED.

6.      Defendants' Motion for Summary Judgment on Plaintiff's state law claims is GRANTED.

7.      This case has been pending for two and a half years and the events at issue occurred almost six years ago.  If the case must go to trial, even further delay in resolution will be incurred, as will expenses.  Having considered all of these factors, the Court finds that it is in the best interests of the parties and judicial efficiency to REFER this action to a Magistrate Judge for court-ordered settlement proceedings.

The Northern District of California has established a Pro Se Prisoner Settlement Program. Certain prisoner civil rights cases may be referred to a magistrate judge for a settlement conference.  The Court finds that a referral is in order now that Plaintiff's due process claim has survived summary judgment.  Thus, this case is REFERRED to Magistrate Judge Nandor Vadas for a settlement conference.

The conference shall take place within **ninety (90) days** of the date of this Order, or as soon thereafter as is convenient to the magistrate judge's calendar.  Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within **ten (10) days** after the conclusion of the conference, file with the Court a report regarding the conference.

The Clerk of the Court shall provide a copy of this Order to Magistrate Judge Vadas.

8.      It is Plaintiff's responsibility to prosecute this case.  Plaintiff must keep the Court informed of any change of address and must comply with the Court's orders in a timely fashion. Pursuant to Northern District Local Rule 3-11 a party proceeding *pro se* whose address changes while an action is pending must promptly file a notice of change of address specifying the new address.  *See* L.R. 3-11(a).  The Court may dismiss without prejudice a complaint when: (1) mail directed to the *pro se* party by the Court has been returned to the Court as not deliverable, and (2) the Court fails to receive within sixty days of this return a written communication from the *pro se* party indicating a current address.  *See* L.R. 3-11(b).

9.      Extensions of time are not favored, though reasonable extensions will be granted. Any motion for an extension of time must be filed no later than **fourteen (14) days** prior to the deadline sought to be extended.

10.      This Order terminates Dkts. 54, 58, and 70.

**IT IS SO ORDERED.**

Dated: August 14, 2014

_____
YVONNE GONZALEZ ROGERS
United States District Court Judge

P:\PRO-SE\YGR\CR.11\Cook6581.denyMSJ.docx

United States District Court
Northern District of California

33